**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| HORIZON MEDICINES LLC, HORIZON THERAPEUTICS IRELAND DAC, HZNP MEDICINES LLC, AND HZNP FINANCE LTD., | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-640-CJB |
| | ) | |
| APOTEX INC. and APOTEX CORP., | ) | |
| | ) | |
| Defendants. | ) | |

Karen E. Keller, Andrew E. Russell, Nathan R. Hoeschen and Emily S. DiBenedetto, SHAW KELLER LLP, Wilmington, DE; Sanya Sukduang, Johnathan R. Davis and Allison E. Elkman, COOLEY LLP, Washington, DC; Mazda Antia and Erin Trenda, COOLEY LLP, San Diego, CA; Attorneys for Plaintiffs.

Kenneth L. Dorsney and Cortlan S. Hitch, MORRIS JAMES LLP, Wilmington, DE; Deepro R. Mukerjee and Lance A. Soderstrom, KATTEN MUCHIN ROSENMAN LLP, New York, NY; Joseph M. Janusz, KATTEN MUCHIN ROSENMAN LLP, Charlotte, NC; Attorneys for Defendants.

**MEMORANDUM OPINION**

November 7, 2022
Wilmington, Delaware

*Christopher J. Burke*

**BURKE, United States Magistrate Judge**

In this patent action filed by Plaintiffs Horizon Medicines LLC, Horizon Therapeutics Ireland DAC, HZNP Medicines LLC and HZNP Finance Ltd. (collectively, "Horizon") against Defendant Apotex Inc. and Apotex Corp. (collectively, "Apotex"), Horizon alleges infringement of claim 12 of United States Patent No. 9,066,913 (the "'913 patent"). (D.I. 1 at ¶ 1) Presently pending before the Court is Apotex's motion for summary judgment (the "Motion"). (D.I. 31) Horizon opposes the Motion. For the reasons set forth below, the Motion is GRANTED.[1]

## I.     BACKGROUND

### A.     Factual Background

The key relevant background facts are not disputed.

In January 2013, Apotex entered into a settlement agreement (the "2013 Settlement Agreement") with Nuvo Research Inc. ("Nuvo"), Mallinckrodt Inc. and Mallinckrodt LLC (together with Mallinckrodt Inc., "Mallinckrodt") to resolve litigation between the parties over a 1.5% strength of diclofenac sodium topical solution product (referred to herein as "PENNSAID® 1.5%"). (D.I. 33, ex. 2) At the time, Nuvo was the owner of United States Patent Nos. 8,217,078 (the "'078 patent") and 8,252,838 (the "'838 patent"). (*Id.* at 1) Mallinckrodt was an exclusive licensee of the '078 and '838 patents and the holder of the New Drug Application for PENNSAID® 1.5%. (*Id.*) The 2013 Settlement Agreement granted Apotex a license to certain patents relating to PENNSAID® 1.5% and also granted Apotex rights relating to potential future manufacture and commercialization of a generic version of a 2% strength topical diclofenac

---

[1]     The parties have jointly consented to the Court's jurisdiction to conduct all proceedings in this case, including trial, the entry of final judgment and all post-trial proceedings. (D.I. 24)

sodium product (referred to herein as "PENNSAID® 2%").  The relevant license provision,

Section 6.1, provides that:

> Mallinckrodt and Nuvo hereby grant, to the extent that they
> lawfully may, to Apotex, on and after the 2.0% Launch Date and
> terminating on the 2.0% Termination Date, a non-exclusive,
> royalty-free and fully paid-up, non-sublicensable, non-transferable
> (except as expressly permitted by Section 11.3 of this Agreement)
> right and license under their respective rights in and to the '078
> Licensed Patent and to the '838 Licensed Patent, and to any other
> patent that they now own or that they may acquire in the future,
> sufficient to allow Apotex to make, have made, use, sell, offer to
> sell, import, and distribute the Apotex 2.0% Product in and for the
> Territory, or to make or have made the Apotex 2% Product in the
> nation of Canada for the sole purpose of thereafter importing the
> Apotex 2.0% Product from the nation of Canada into the Territory
> and to sell, offer to sell, and distribute the Apotex 2.0% Product in
> and for the Territory.

(*Id.* at § 6.1)  The "'838 Licensed Patent" is defined in the 2013 Settlement Agreement as the

"['838 patent] and any patents that issue from any divisions, continuations, reissues or

reexaminations thereof."  (*Id.* at § 1.8)

The '913 patent asserted in this case is entitled "Diclofenac Topical Formulation" and it

is a continuation of the '838 patent.  (D.I. 1, ex. A; D.I. 32 at 4 & n.1)  The '913 patent issued

from United States Patent Application No. 14/497,096 (the "'096 application").  (D.I. 1, ex. A)

The '096 application was filed by Nuvo on September 25, 2014.  (*Id.*; D.I. 33, ex. 4 at 5)

On October 17, 2014—less than a month after Nuvo filed the '096 application—Nuvo

and Horizon entered into an Asset Purchase Agreement ("APA") by which Horizon acquired

PENNSAID® 2% and Nuvo's related patent rights.  (D.I. 33, ex. 6)  The intellectual property

that Horizon purchased included the '096 application (and the '838 patent).  (*Id.*, ex. 7 at

Schedule 1)  The '096 application later issued to Horizon as the '913 patent on June 30, 2015.

(D.I. 1, ex. A)[2]

On August 4, 2020, Apotex received tentative approval from the United States Food and

Drug Administration ("FDA") for its generic PENNSAID® 2% product (the "Apotex 2.0%

Product").  (D.I. 33, ex. 9)  The FDA informed Apotex that it was "unable to grant final

approval to [Apotex's Abbreviated New Drug Application ('ANDA')]" because "[p]rior to the

submission of [Apotex's] ANDA, another applicant . . . submitted a substantially complete

ANDA" for a generic PENNSAID® 2% product.  (*Id.* at 3)  Accordingly, the FDA stated that

Apotex's ANDA would be eligible for final approval on a date that is 180 days following the

commercial marketing date by a first filer.  (*Id.*)

At the time, Actavis held first-filer status for generic PENNSAID® 2%.  (*See* D.I. 32 at

7; D.I. 52 at 2)  However, on May 5, 2022, Actavis's first-filer status was "[e]xtinguished."

(D.I. 33, ex. 10)  As a result, on May 6, 2022, Apotex received FDA approval to market its

generic PENNSAID® 2% product and immediately launched its Apotex 2.0% Product.  (*Id.*, ex.

11; *see also* D.I. 32 at 7; D.I. 52 at 8)

Additional relevant facts will be set out as necessary in Section III below.

**B.     Procedural Background**

Horizon commenced this action on May 13, 2022.  (D.I. 1)  Apotex filed the instant

Motion on June 24, 2022.  (D.I. 31)[3]  The Motion was fully briefed as of July 29, 2022.  (D.I. 64)

---

[2]        The '838 and '913 patents share the same specification describing the invention
discussed therein, and they have the same title, abstract, and inventors.  (D.I. 69 at 1 n.2 (citing
*id.*, exs. 1-2))

[3]        Four days after commencing this action, Horizon filed a motion for preliminary
injunction.  (D.I. 7)  Apotex subsequently agreed to forego argument on preliminary injunction

The Court heard argument on the Motion on August 23, 2022.  (D.I. 67 (hereinafter "Tr."))  The parties submitted supplemental letter briefs on August 30, 2022.  (D.I. 68; D.I. 69)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986).  If the moving party has sufficiently demonstrated the absence of such a dispute, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial."  *Id.* at 587 (internal quotation marks, citation and emphasis omitted).  If the nonmoving party fails to make a sufficient showing in this regard, then the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  During this process, the Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

However, in order to defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  Facts that could alter

---

proceedings and agreed to entry of such injunctive relief, and the parties agreed to litigate an early summary judgment motion on Apotex's license defense.  (D.I. 21)

the outcome are "material," and a factual dispute is "genuine," only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

A party asserting that a fact cannot be—or, alternatively, asserting that a fact is—genuinely disputed must support the assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

## III.    DISCUSSION

Apotex argues that through the 2013 Settlement Agreement, Nuvo granted Apotex a license to the '913 patent that is binding on Horizon, and that this license defeats Horizon's infringement claim as a matter of law. (D.I. 32 at 2, 18)[4]  Horizon retorts that the 2013 Settlement Agreement does not encumber the '913 patent—a patent that did not exist at the time of the settlement, and that subsequently issued solely to Horizon. (D.I. 52 at 1)

The parties' positions raise two key issues that are important not only to the outcome of this case, but also more generally to the realm of patent licensing. (D.I. 64 at 1 (Apotex arguing that "[t]he ramifications of Horizon's [arguments] cannot be understated" and that those

---

[4]        A license defense is an affirmative defense to a claim of patent infringement. *See, e.g., CXT Sys., Inc. v. Acad., Ltd.*, Case No. 2:18-cv-00171-RWS-RSP, 2020 WL 9936134, at *4 (E.D. Tex. Jan. 30, 2020) (citing *McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 920 (Fed. Cir. 1995)).

arguments are "unprecedented")); Tr. at 68-69 (Horizon asserting that the "[United States Court of Appeals for the] Federal Circuit has never addressed the issue that [the Court] is going to address"))  First, can a licensor (here, Nuvo) grant a license to a future continuation patent that does not ultimately issue to that licensor, and instead issues to a third party (here, Horizon)? And second, if Nuvo can lawfully do so, does the 2013 Settlement Agreement utilize language that is sufficient to accomplish this?  The Court will address these issues in turn.

A.  **Can a Licensor Ever Grant a License to a Future Continuation Patent that Does Not Ultimately Issue to that Licensor?**

In its briefing, Horizon's primary argument appeared to be that Nuvo did not and could not grant Apotex a license to the '913 patent, because that continuation patent did not issue to Nuvo (instead, it issued to Horizon in June 2015) and thus Nuvo did not own it.  Horizon's position—one that it continually repeated—was that "one cannot convey what one does not own" and therefore, "Nuvo cannot have given something to Apotex that Nuvo never owned in the first place."  (D.I. 52 at 1-2 (quoting *TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1275 (Fed. Cir. 2009)); *see also id.* at 2 ("As it is undisputed that Nuvo . . . never owned or acquired the '913 patent, [it] could not license rights to the '913 patent to Apotex."); *id.* at 10 ("Nuvo . . . never owned any exclusion rights under the '913 patent, which was prosecuted by and issued to Horizon.") (emphasis omitted); *id.* at 16 n.8 ("[T]he issue here is whether a patent license attaches to a new patent owned by a third party that was not owned by the licensor."))  In other words, in the above-referenced portions of its briefing, Horizon seemed pretty clearly to be arguing that because the '913 patent did not issue to Nuvo, this meant that

*under no circumstances* could Nuvo have lawfully licensed rights to that patent to Apotex—full stop.[5]

However, during oral argument, Horizon stepped back a bit from this rather extreme position. Instead, there it acknowledged that a licensor *can*, in certain circumstances, grant a license to a future patent that does not ultimately issue to that licensor. (Tr. at 75-77, 79-80) To that end, Horizon's counsel asserted that an entity could "grant a license to subject matter as a whole [by licensing patent applications such that] whatever comes out of that subject as a whole in a later patent, [the licensor is giving the licensee] a right to" that property. (*Id.* at 76; *see also id.* at 80-81 (Horizon's counsel asserting that a licensor could convey a license to "general subject matter . . . . [a]nd whatever comes out of that general subject matter, if it issues as a patent, [the licensee] will get a . . . license to that" patent))[6] But Horizon then argued that the 2013 Settlement Agreement simply does not accomplish this (an argument that the Court will take up shortly below). (*Id.* at 82, 84)

---

[5]        Apotex also seems to have understood that this was the primary argument that Horizon was making in its answering brief. (D.I. 32 at 15 ("Horizon has argued that because the '913 patent issued to Horizon, despite issuing from an application filed by Nuvo, Nuvo had no rights to license to Apotex."); *see also* Apotex's Summary Judgment Presentation, Slide 10)

[6]        In fairness, there was one point in its answering brief where Horizon seemed to be nodding at the position it described more fully during oral argument. On page 13 of its answering brief, Horizon noted that "Apotex's own licensing history . . . reflects that it knew it could have negotiated (if Nuvo were willing to agree to it) broader rights to 'patent applications,' and could have addressed [] applications that are transferred to a third party that prosecutes them to issuance." (D.I. 52 at 13) Horizon then pointed to a license agreement that Apotex struck with Vanda Pharmaceuticals, in which the parties specified that "patent rights" extended to particular patents and "the patent applications giving rise thereto" and "all other relevant patents and patent applications" covering the relevant products. (*Id.* at 13-14 (quoting D.I. 53, ex. F at § 1.10)) Unlike in that agreement, here, according to Horizon, "Apotex did not secure broader [rights] for itself[.]" (*Id.* at 14)

It makes sense that Horizon gave up on the very broad argument it seemed to be making in its briefing.  That is because the law supports the principle that a licensor *can* grant a license to a future continuation patent that does not ultimately issue to that licensor.  (D.I. 32 at 15; Tr. at 34)  The Court will next explain why this is so, both by looking to legal principles relating to patent licensing and by assessing relevant Federal Circuit caselaw.[7]

The grant of a patent merely provides the patentee with the right to exclude others from practicing the invention; it does not provide the patentee with an affirmative right to practice the patent.  *TransCore*, 563 F.3d at 1275 (citing 35 U.S.C. § 154(a)(1)).  It follows that the grant of a non-exclusive patent license is, in essence, a promise by the licensor not to sue the licensee.  *Id.* at 1275-76.  And because "the owner of a patent cannot transfer an interest greater than that which it possesses"—i.e., because one cannot convey what one does not own—an assignee of a patent takes that patent subject to the patent's legal encumbrances, including any previously-issued licenses.  *Datatreasury Corp. v. Wells Fargo & Co.*, 522 F.3d 1368, 1372 (Fed. Cir. 2008).  In other words, while the assignment of patent rights may alter the ownership of those rights, such an assignment cannot expand those rights, and thus the assignee of a patent is bound by prior licenses issued with respect to that patent.  *See id.*; *Ira Svendsgaard & Assoc., Inc. v. AllFasteners USA, LLC*, Case No. 1:20 CV 328, 2021 WL 4502798, at *3 (N.D. Ohio Oct. 1, 2020); *Innovus Prime, LLC v. Panasonic Corp.*, Case No. C-12-00660-RMW, 2013 WL

---

[7]       It is undisputed here that Delaware law applies to the interpretation of the 2013 Settlement Agreement.  (D.I. 32 at 8; D.I. 52 at 8)  The law of the Federal Circuit, meanwhile, governs issues involved in the substance of enforcement of a patent right, such as the effect of a patent license grant.  *See, e.g.*, *Amana Refrigeration, Inc. v. Quadlux, Inc.*, 172 F.3d 852, 856 (Fed. Cir. 1999); *Cardiovascular Sys., Inc. v. Cardio Flow, Inc.*, 498 F. Supp. 3d 1080, 1090 (D. Minn. 2020); (Tr. at 22-23, 108-09).

9

3354390, at *5 (N.D. Cal. July 2, 2013).  This is true even if the assignee was unaware of a prior

license agreement.  *Innovus Prime*, 2013 WL 3354390, at *5.

        In light of these principles, Apotex contends that if it has a license to the '913 patent via

the 2013 Settlement Agreement, then that license is binding on Horizon (even though Horizon

was not a party to the 2013 Settlement Agreement) because the license runs with the patent.

(D.I. 32 at 1, 14; D.I. 64 at 6)  That is, Apotex's argument is that because Nuvo could not have

sued it for infringement of the '913 patent under the terms of the agreement, then neither can

Horizon.  And Apotex asserts that its license right would not evaporate simply because that

patent ultimately issued to Horizon instead of Nuvo.  (D.I. 32 at 1)

        As noted above, in its briefing, Horizon's prime retort was that Nuvo could not have

licensed the '913 patent to Apotex since "Nuvo never owned [that patent] in the first place."

(D.I. 52 at 1)  The caselaw counsels otherwise.  (*See* D.I. 32 at 15; D.I. 64 at 6; Tr. at 25-26)

        More specifically, the Federal Circuit's decision in *Intel Corp. v. Negotiated Data

Solutions, Inc.*, 703 F.3d 1360 (Fed. Cir. 2012) is particularly helpful here.  *Intel* clearly indicates

that, at least in certain circumstances, a licensor *can* issue a license to a future-issued patent,

even if that patent issues to someone other than the licensor.  (D.I. 32 at 15; D.I. 64 at 4; Tr. at

25-26, 34, 115)  Because *Intel* is a key case, the Court will now discuss it in some detail.

        In *Intel*, Intel Corp. ("Intel") and Negotiated Data Solutions, Inc.'s ("N-Data")

predecessor-in-interest, National Semiconductor Corp. ("National"), entered into a patent cross-

licensing agreement (the "National Agreement") in 1976.  *Intel*, 703 F.3d at 1361.  The National

Agreement gave Intel a non-exclusive license to patents (the "National Patents") that National

owned and that had first effective filing dates before the license agreement.  *Id.* at 1361-62.  In

1998, National assigned four of the National Patents (the "Original Patents") to Vertical

Networks, Inc. ("Vertical").  *Id.* at 1362.  Thereafter, between 1998 and 1999, Vertical filed broadening reissue applications with the United States Patent and Trademark Office ("PTO") for three of the Original Patents; through these reissue applications, Vertical increased the total number of claims in the three patents from 77 to 378.  *Id.*[8]  Vertical subsequently assigned the Original Patents and the reissue applications to N-Data.  *Id.*  Following the expiration of the National Agreement in 2003, the reissue patents corresponding to the three Original Patents (the "Reissue Patents") issued to N-Data.  *Id.*  N-Data thereafter sued Dell, Inc. ("Dell"), a customer of Intel, alleging infringement of, *inter alia*, the Reissue Patents.  *Id.*  In response, Intel sought a declaratory judgment that, pursuant to the National Agreement, Intel and its customers were licensed to the National Patents as well as to all Reissue Patents owned by N-Data that were derived from any of the National Patents.  *Id.*

Intel and N-Data filed cross-motions for summary judgment on the issue.  *Id.*  Intel argued that the National Agreement "naturally extends to reissue patents that derive from National Patents" such that the Reissue Patents should be treated as National Patents that were licensed to Intel under the agreement.  *Id.*  N-Data, for its part, argued that "the Reissue Patents are separate patents that cover unique property rights distinct from the rights covered by the Original Patents" and because the Reissue Patents "were issued directly to N-Data after the [National] Agreement had expired, they are not National Patents and are not licensed to Intel."  *Id.*  The district court ultimately agreed with Intel, concluding that the intent of Intel and

---

[8]     With a reissue patent, a patentee may correct an error in a patent that renders the patent wholly or partly inoperative or invalid, or in a patent where the patentee claimed more or less than he had a right to claim; nevertheless, a reissue patent must still be based on "the invention disclosed in the original patent" and may not introduce "new matter[.]"  35 U.S.C. § 251.

National in the National Agreement was to "grant broad rights to all patents owned or controlled by the other party for the life of the patents . . . and avoid future infringement suits." *Id.* at 1363 (internal quotation marks and citation omitted).[9]

On appeal, the Federal Circuit affirmed. The *Intel* Court first considered the parties' competing arguments regarding the statute governing the effect of reissue patents, 35 U.S.C. § 252 ("Section 252"). In support of its position that the license grant in the National Agreement only covered the Original Patents and not the Reissue Patents, N-Data had argued that a reissue patent "is a distinct property right that does not simply replace the original patent in an existing agreement." *Id.* at 1364. And in support of its contrary argument that the National Agreement extended to the Reissue Patents, Intel's position was that: (1) Section 252 provides that a reissue patent takes the place of the original patent *nunc pro tunc*, "as if the reissued patent had been issued at the time of, and instead of, the original"; and so (2) the Reissue Patents should be treated as if they were the Original Patents (which were licensed to Intel). *Id.* In addressing this point, the Federal Circuit disagreed with Intel, explaining that Section 252 makes it clear "that a reissue patent does not simply replace an original patent *nunc pro tunc*." *Id.*

The *Intel* Court next went on to consider whether the "National Agreement itself is properly interpreted . . . to extend the license granted thereunder to the Reissue Patents." *Id.* at 1364-65. The Federal Circuit explained that the statute governing the reissue of defective patents, 35 U.S.C. § 251, established that a reissue patent issues "for *the invention* disclosed in the original patent" and prohibits the addition of "new matter" in the reissue patent. *Id.* at 1366

---

[9]      California law applied to the interpretation of the National Agreement, which requires that a contract be interpreted to give effect to the parties' mutual intent. *Intel*, 703 F.3d at 1365.

(quoting 35 U.S.C. § 251) (certain emphasis omitted).  It found that this language signals to potential licensees that—in the absence of language in a licensing agreement to the contrary—a license to a patent that is not directed to any specific claims "will extend to the full extent of protection provided by law *to the invention which is the subject of that patent*."  *Id.* (emphasis added).  And so the *Intel* Court found it reasonable that Intel's and National's mutual intent when they entered into the National Agreement "was that the broad and unrestricted grant of license under National Patents extended to any reissues thereof."  *Id.*

In reaching this decision, the *Intel* Court explained that two prior decisions by the Federal Circuit—in which the Court "analyzed a licensee's rights when the patent holder received a continuation patent that, if asserted against the licensee, would derogate from the licensee's right to practice the previously licensed patents"—supported the Court's conclusion.  *Id.*  These cases, *TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271 (Fed. Cir. 2009) and *Gen. Protecht Grp., Inc. v. Leviton Mfg. Co.*, 651 F.3d 1355 (Fed. Cir. 2011), established that allowing the patentee to sue on subsequent patents that "contain the same inventive subject matter that was licensed[] risks derogating rights for which the licensee has paid consideration."  *Intel*, 703 F.3d at 1366.[10]  The *Intel* Court explained that the same concern applies to situations involving reissue patents "where the full extent of an invention disclosed in a patent is licensed[.]"  *Id.* at 1366-67.  While the National Agreement did not expressly mention any reissue patents, the

---

[10]    In these two cases, the Federal Circuit ruled that absent a clear indication of mutual intent to the contrary, an express license to a patent also includes an implied license to continuation patents, even if those patents issue subsequent to the license agreement, because the same inventive subject matter is disclosed in both patents.  *Gen. Protecht Grp.*, 651 F.3d at 1361; *TransCore*, 563 F.3d at 1278-79; *see also Cheetah Omni LLC v. AT&T Servs., Inc.*, 949 F.3d 691, 695-96 (Fed. Cir. 2020).

Court noted that the license grant therein to the National Patents was without limitation, as it did not reference any specific claims of those patents.  *Id.* at 1367.  Therefore, the Court concluded:

> The [National] Agreement thus evinces the parties' intent that the license so granted extend not only to the claims then in existence *but also to the full scope of any coverage available by way of reissue for the invention disclosed*.  To interpret the [National] Agreement otherwise would allow the unilateral act of the licensor to place the licensee, which sought to eliminate any infringement risk and effect a global peace with the licensor for all claims in all patents, in a position of being exposed to further risk relating to the *exact same inventions* that were subject to the license.

*Id.* (emphasis added).

In sum, the *Intel* Court found that pursuant to the National Agreement, National had the right to and did license to Intel patents:  (1) that were not expressly referenced in that agreement; and (2) that issued subsequent to the agreement; to (3) N-Data, a non-party to the agreement.  Importantly, the Federal Circuit was not bothered by the fact that the Reissue Patents issued directly to N-Data (and not to National, the licensor).  (*See* Tr. at 43-44)  Rather, the Court sought to give effect to the mutual intent of the parties to the National Agreement—National and Intel—in finding that National had the right to and did grant a license to the *full scope of the invention* described in the National Patents, such that the agreement:  (1) encompassed subsequent reissue patents covering the inventive subject matter described in the National Patents; and (2) protected the licensee's ability to practice that subject matter.  (*Id.* at 44)[11]  *Cf.*

---

[11]     Horizon argues that a predecessor case to *Intel*, *Intergraph Corp. v. Intel Corp.*, 241 F.3d 1353 (Fed. Cir. 2001), is more on point than *Intel* and shows that Apotex's reading of the law is wrong.  (D.I. 52 at 10-11; Tr. at 69, 95-96, 109)  In *Intergraph*, the Federal Circuit reversed the lower court's grant of summary judgment that Intel was licensed to practice the inventions of Intergraph Corporation's ("Intergraph") patents (the "Clipper patents").  *Intergraph*, 241 F.3d at 1353.  Intergraph, Fairchild Semiconductor Corp. ("Fairchild") and National Semiconductor Company ("National") had entered into an agreement under which National would purchase Fairchild and immediately cause Fairchild to sell a portfolio including

*Hollister Inc. v. ConvaTec Inc.*, Case No. 10 C 6431, 2011 WL 13193423, at *1, *5 (N.D. Ill. July 5, 2011) (concluding that a release agreement between the defendant and a prior owner of the patents-in-suit defeated claims of infringement, even though the patents' applications were filed by the prior owner but the patents had subsequently issued to the plaintiff).

Horizon attempts to distinguish *Intel* on the ground that in that case, the newly-asserted patents at issue were *reissue* patents that issued from existing licensed patents. In this regard, Horizon suggests that *Intel* turned on the fact that "a reissue is a correction of an issued patent"—and that, as a legal matter, there was "no difference" between the Reissue Patents and the Original Patents in *Intel*, because the law "treats the [R]eissue[] patents . . . the same as the

_____

the Clipper patent applications to Intergraph upon closing. *Id.* at 1354. Intel had a cross-license agreement with National at the time, and it argued that because National acquired control of the Clipper patent applications immediately before they were transferred to Intergraph, the applications were covered by the cross-license agreement. *Id.* at 1354-55. The Court rejected Intel's argument, explaining that: (1) the National/Intel cross-license agreement provided a license to National patent applications that, "when issued, will become" National Patents; and (2) this provision was not met, even though National "momentarily possessed" the Clipper patent applications on the day of the closing before the deal was complete, because nothing in the contract supported the interpretation that the parties intended that "unknown persons might acquire a free license from National during the hour of closing." *Id.* at 1355-56.

Nothing in *Intergraph* suggests that a patentee cannot, under any circumstances, license rights to a patent that ultimately issues to another entity. Instead, the license decision in *Intergraph* turned on the particular language found in the license agreement at issue. In *Intergraph*, the actual wording of that agreement made it clear that the purported licensor (National) simply had not licensed the patent applications at issue to the purported licensee (Intel), in light of the fact that National only held the applications momentarily as part of the corporate transaction at issue. (D.I. 64 at 4); *see also Intel*, 703 F.3d at 1365 ("In this regard *Intergraph* is inapposite—that case only dealt with whether or not the National Agreement covered patent applications held momentarily by National as part of a corporate transaction in which a subsidiary possessed the applications but then immediately sold them, such that the applications never issued as National Patents."). In contrast, as the Court will explain in more detail below, here the language in the 2013 Settlement Agreement supports Apotex's claim to a license to the '913 patent.

15

[O]riginal [P]atents[.]"  (D.I. 52 at 15-16; Tr. at 70, 72; *see also* Tr. at 64-65; D.I. 68 at 1 & n.1)[12]  Put differently, Horizon's argument is that in *Intel*:  (1) since National had licensed the Original Patents to Intel and (2) since there is purportedly no real legal difference between the Original Patents and the Reissue Patents; then (3) that is why it was determined that National had also licensed Intel to the Reissue Patents too (even though those Reissue Patents did not technically issue until years after the license grant, and when they did, they issued to a party other than National, the licensor).  As was noted above, we are not dealing with a reissue patent in this case; the '913 patent is a continuation of the '838 patent.  And so for this reason, Horizon suggests that *Intel* should have no impact here.  (D.I. 52 at 15-16)

The Court is not persuaded that any distinction between reissue patents and continuation patents[13] should lessen its reliance on *Intel* or make a difference to its analysis.  (*See* Tr. at 70-71 (Horizon's counsel agreeing that if there "was no difference between a continuation and a reissue" patent for purposes of the Court's analysis of *Intel*, then *Intel* would "really help"

---

[12]     Horizon further suggests that the Federal Circuit's holding in *Intel* should have no bearing on the Court's decision here because in that case, Vertical acquired assets from National "subject to any existing licenses and other encumbrances that [the assignor] may have granted or obligated itself . . . includ[ing] broad crosslicenses."  (D.I. 52 at 16 (internal quotation marks, citations and emphasis omitted); Tr. at 67-68)  However, the *Intel* Court never mentioned this fact in its opinion, and it thus does not appear that this particular bit of contractual language impacted the Court's decision in any way.  (*See* Tr. at 67-68)

[13]     A continuation application must be filed while a previously filed patent application remains pending, in order for the continuation to get the same priority date as the prior application.  35 U.S.C. § 120; *In re Staats*, 671 F.3d 1350, 1355 (Fed. Cir. 2012).  A reissue application may be filed at any time after a patent issues, except that if a reissue application broadens the scope of the claims, it must be filed within two years from the date that the original patent issued.  35 U.S.C. § 251(d).

provide an answer to the Court regarding this dispute))  The Court so concludes for a couple of reasons.

For one thing, the *Intel* Court *rejected* the argument that a reissue patent simply takes the place of the original patent, as if the original patent had never existed.  *Intel*, 703 F.3d at 1364. To the contrary, *Intel* makes clear that a reissue patent "does not simply replace" an original patent; the Federal Circuit noted that a reissue patent is a distinct property right from an original patent that may, *inter alia*, have a different claim scope as compared to the original patent.  *Id*.

Moreover, *Intel* explains that the Federal Circuit's holding there would apply equally to situations involving subsequently issued continuation patents "where the full extent of an invention disclosed in a [prior] patent is licensed."  *Id.* at 1366-67.  Indeed, *Intel expressly says* that allowing the patent holder to sue on later-issued patents in such a scenario risks derogating the rights of the licensee "regardless of whether the case involves reissue patents or continuation patents."  *Id.*  And it makes good sense that the rationale expressed in *Intel* would apply to a continuation patent issuing from an originally-licensed patent—because a continuation patent issues from a continuation application, which "is an application *for the invention(s)* disclosed in a prior-filed copending nonprovisional application[.]"  MPEP § 201.07 (emphasis added).  Just as is the case with reissue patents, *see* 35 U.S.C. § 251, "[t]he disclosure presented in the continuation *must not include* any subject matter which would constitute *new matter* if submitted as an amendment to the parent application[,]" MPEP § 201.07 (emphasis added); *see also Intel*, 703 F.3d at 1366 (emphasizing that continuation patents are "based on the *same disclosure* as" previous patents and by definition "'*can claim no new invention not already supported in the earlier issued patents*'") (quoting *Gen. Protecht Grp.*, 651 F.3d at 1361) (certain emphasis added); *see also Endo Pharms. Inc. v. Actavis, Inc.*, 746 F.3d 1371, 1374 n.1 (Fed. Cir. 2014)

17

("The continuation [patent] must . . . have the same disclosure as the prior patent."); (D.I. 69 at 2; Tr. at 38-39).[14]

---

[14]    In its supplemental letter brief, Horizon argued that a continuation patent is treated as "separate" and "distinct" property from an original parent patent, and "ha[s its] own claims and [its] own exclusion rights." (D.I. 68 at 1-2)  Therefore, according to Horizon, the fact that the '913 patent is a continuation of the '838 patent should be irrelevant to the Court's analysis with respect to the instant dispute.  (*Id.*)

It is true that courts have treated continuation patents as conveying "separate" property rights from parent patents. *See, e.g.*, *ACC Climate Control v. Bergstrom, Inc.*, Cause No. 3:07-CV-125-TS, 2010 WL 746750, at *2 (N.D. Ind. Mar. 2, 2010) (denying the plaintiff's motion to supplement its complaint to add continuation patents of patents already in the case, and noting that "each patent is by definition 'new,' and is legally protected separately from any other patent") (*cited in* D.I. 68 at 1).  This makes sense, in that every continuation patent is going to have different claims than those in its parent patent (claims that may be broader, narrower or related to another aspect of the invention that the inventor claimed in the original application). *See Hakim v. Cannon Avent Grp., PLC*, 479 F.3d 1313, 1317 (Fed. Cir. 2007); (D.I. 69 at 1).  And so in that sense, the continuation patent is a "separate" or "distinct" patent/property right as compared to the parent patent.  (Tr. at 71)  In *Intel*, N-Data noted this fact and tried to use it in support of a similar argument to the one Horizon makes here—i.e., N-Data asserted that the reissue patents that issued to it, and not to National, constituted "distinct" property rights as compared to the patents from which they descended.  *Intel*, 703 F.3d at 1364; *see also, e.g.*, *Eby v. King*, 158 U.S. 366, 373 (1895) ("[I]f a reissue is granted, the patentee has no rights except such as grow out of the reissued patent.  He has none under the original.  That is extinguished.").  But even though this was so, what was ultimately important to the *Intel* Court was that the reissued patent necessarily relates to the *invention that was disclosed in the original patent itself*.  In light of this, *Intel* held that a licensor could license a future reissue patent to a third party, even if the reissue patent actually ended up issuing to another entity, so long as the licensor owned the rights to the patent from which the reissued patent descended, and so long as the language of the license agreement at issue "evinces an intent" to do so.  *Intel*, 703 F.3d at 1365, 1367.

The Court further notes here that the implied license doctrine, described above, *see supra* n.10, underscores how tied together continuation patents and parent patents are in the licensing context.  Indeed, Apotex argues that to the extent it does not have an express license to the '913 patent, it has an implied license thereto pursuant to this doctrine.  (D.I. 32 at 10-13)  The Court need not address this argument in light of its finding below that Apotex has an express license.  But the implied license doctrine does emphasize the fact that continuation patents have the same disclosure as their prior patents, which is significant when it comes to patent licensing issues like the ones at play in this case.

18

In the end, *Intel* tells us that it is *legally possible* for a licensor to grant a license to a future continuation patent that does not ultimately issue to that licensor (and instead issues to a third party). This is because if the licensor owns a parent patent at the time it executes a license agreement, then the licensor necessarily has the legal ability to promise freedom from suit as to *the invention disclosed in* that patent. The licensor thus can, if it wishes, extend a license to a future-issued continuation patent, so that the licensee will know it is free from suit in the future as to that continuation patent—even if the continuation patent ultimately later issues to a third party.

Understanding all of this, the Court next turns to whether the language of the 2013 Settlement Agreement *actually provided* Apotex with a license to the '913 patent.

**B.    Does the 2013 Settlement Agreement Utilize Language Sufficient to Grant a License to a Future Continuation Patent that Does Not Ultimately Issue to the Original Licensor?**

As noted above, Delaware law applies to the interpretation of the 2013 Settlement Agreement. "Delaware law adheres to the objective theory of contracts," which means that "a contract's construction should be that which would be understood by an objective, reasonable third party." *TQ Delta, LLC v. ADTRAN, Inc.*, Civil Action No. 14-954-RGA, Civil Action No. 15-121-RGA, 2019 WL 3304705, at *3 (D. Del. July 23, 2019) (internal quotation marks and citation omitted); *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014). Pursuant to this standard, a court must "give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *Salamone*, 106 A.3d at 368 (internal quotation marks and citation omitted). When a motion for summary judgment presents a contract dispute implicating Delaware law, the threshold inquiry is whether the contract is ambiguous. *TQ Delta, LLC*, 2019 WL 3304705, at *3; *United Rentals,*

19

*Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).  A contract is ambiguous if it is "fairly susceptible to two or more reasonable interpretations."  *TQ Delta, LLC*, 2019 WL 3304705, at *3 (internal quotation marks and citations omitted).  Here, it is undisputed that the relevant terms of the 2013 Settlement Agreement are not ambiguous.  (D.I. 32 at 9; D.I. 52 at 1; Tr. at 19, 23, 107)

The key remaining question is whether the 2013 Settlement Agreement evinces the intent of the parties to that agreement "that the license so granted extend not only to the claims then in existence but also to the full scope of any coverage available by way of [continuation patents] for the invention disclosed[?]"  *Intel*, 703 F.3d at 1367.  The answer to that question is a very clear yes.

As an initial matter, the language of the Section 1.8 could not be more explicit in defining the "'838 Licensed Patent" to expressly include, in addition to the '838 patent itself, "*any patents that issue from any* divisions, *continuations*, reissues or reexaminations *thereof*."  (D.I. 33, ex. 2 at § 1.8 (emphasis added))  That language clearly means that, *inter alia*, if a patent were to issue in the future from a continuation application of the '838 patent, then the parties intended that this future patent would be included in the definition of "'838 Licensed Patent."  (Tr. at 111-12)[15]

Next, turning to the license grant itself, Section 6.1 grants to Apotex a license, *inter alia*, to the "'838 Licensed Patent," which, as we know from the definition set out in Section 1.8, includes a license to any patents that issue from any continuation applications of the '838

---

[15]       While Section 1.8 does not include the word "application" after "continuation[,]" as Apotex's counsel pointed out, it has to mean that—obviously a patent would "issue from a[] . . . continuation[]" *application*.  (Tr. at 111-12)

patent.[16]   Thus, the 2013 Settlement Agreement makes evident that its parties intended for the license grant to extend to the '913 patent, which undisputedly issued from a continuation application of the '838 patent.

Horizon pushes back on this conclusion in a few ways, which the Court will address in turn.

First, Horizon argues that Section 6.1's license grant to "any other patent that [Nuvo and Mallinckrodt] now own or that they may acquire in the future" limits the scope of all licenses granted in the agreement to "issued patents that were owned or later acquired by Nuvo"; since Nuvo never owned the '913 patent, Horizon argues that this part of Section 6.1 means that the patent is not covered by the 2013 Settlement Agreement.  (D.I. 52 at 1-2, 9-10; D.I. 68 at 2; Tr. at 62, 64, 88)  That is not a persuasive reading of Section 6.1.  That section grants a license, *inter alia*, "to the '838 Licensed Patent" (which we know from Section 1.8 includes any patents that issue from any continuations thereof) "*and* to any *other patent* that [Nuvo and Mallinckrodt] now own or that they may acquire in the future, sufficient to allow Apotex to make, have made, use, sell, offer to sell, import, and distribute the Apotex 2.0% Product[.]"  (D.I. 33, ex. 2 at §§ 1.8 & 6.1 (emphasis added))  The grant to any "other patent" that Nuvo now owns or may acquire in the future is clearly a grant that is *in addition to*—i.e, separate and apart from—the license grant relating to the "'838 Licensed Patent."  (D.I. 64 at 2-3; Tr. at 63-64)

Next, Horizon highlights the facts that:  (1) the language of Section 6.1 provides a license "under [Nuvo]'s *respective rights in and to* . . . the '838 Licensed Patent"; and (2) a "whereas" clause found at the beginning of the agreement provides that "WHEREAS, Nuvo *owns*" the '838

---

[16]     The license grant is not limited to any particular claims of the '838 patent—it is licensing the entire invention referenced therein.

patent.  (Horizon's Summary Judgment Presentation, Slides 1-2 (citing D.I. 33, ex. 2 at 1, § 6.1) (certain emphasis in original))  Horizon suggests that these two contractual provisions also demonstrate that the scope of the license is limited to patents that Nuvo *owns*.  (*Id*.; *see also* D.I. 52 at 9-10)  Of course, Nuvo did own the '838 patent at the time of the 2013 Settlement Agreement, and this contractual language certainly reflects that fact.  But Section 6.1's license grant implicated the "rights [that Nuvo had] in and to . . . the '838 Licensed Patent[,]" and Section 1.8 defined the "'838 Licensed Patent" to include future patents that issue from continuation applications of the '838 patent.  (D.I. 33, ex. 2 at §§ 1.8, 6.1)  And as noted above, at the time of the 2013 Settlement Agreement, Nuvo *did* "own[]" and have certain legal "rights" to the full scope of the invention disclosed in the '838 patent—such that it had the lawful ability to grant a license not just to the '838 patent itself, but also to what would ultimately become the '913 patent.[17]  So nothing about these contractual provisions—and their focus on Nuvo's "rights" or the intellectual property that Nuvo "owns"—alters the Court's decision here.

Lastly, during oral argument, Horizon's chief contention was that:  (1) while it would have been possible for Nuvo to lawfully grant Apotex a license to the '913 patent (even though that patent ultimately issued to Horizon); (2) to do so, Nuvo would have had to expressly license

---

[17]     While Section 6.1's license grant (i.e., to any other patents that Nuvo "now own[s] or [] may acquire in the future, sufficient to allow Apotex to make [and] sell . . . the Apotex 2.0% Product") does not limit the 2013 Settlement Agreement in the way that Horizon wishes, it does help to further demonstrate the intent of the parties to that Agreement.  (D.I. 33, ex. 2 at § 6.1)  That is, it helps to show that the parties' intent was to "resolve any future disputes in connection with" Apotex's 2.0% Product by granting licenses to the '078 and '838 patents (and to any patents issuing from any divisions, continuations, reissues or reexaminations of those patents), as well as to any other unidentified patent that Nuvo might then or later own that related to Apotex's ability to make and sell its 2.0% Product.  (D.I. 33, ex. 2 at 2; *see* Tr. at 31-33)  Thus, this was intended to be a broad license grant; Horizon's narrow view of the license at issue does not gibe with that intent.

*the application* that matured into that later patent; but (3) Nuvo did not do this in the 2013

Settlement Agreement (i.e., it did not grant a license to, for example any "continuation

application of the '838 patent") and (4) instead, via Section 1.8, Nuvo only licensed "any *patents*

that issue from any . . . continuations" of the '838 patent.  (Tr. at 72-73 (Horizon's counsel

arguing that "the '913 patent is an issued patent [but] the agreement doesn't transfer any license

*to patent applications*") (emphasis added); *id*. at 85 (Horizon's counsel asserting that the 2013

Settlement Agreement's licensing provisions did not help Apotex due to the agreement's failure

to "reference *the patent application*" that led to the '913 patent) (emphasis added); *see also id*. at

77, 81, 86, 89)  Horizon argues that only if Nuvo had granted Apotex a license to the *patent*

*application* that led to the '913 patent, would Nuvo be "licensing the subject matter [later

claimed in the '913 patent] through [its license to the] patent application[.]"  (*Id.* at 74; *see also*

*id.* at 79-80)

What does Horizon point to in support of this argument?  It mainly cites to the decision

of the United States District Court for the District of Delaware ("District of Delaware") in

*Cornell Univ. v. Illumina, Inc.*, C.A. No. 10-433-LPS-MPT, 2014 WL 12601516 (D. Del. Sept.

29, 2014).  (*Id.* at 82-83, 109; *see also* D.I. 52 at 10)  According to Horizon, *Cornell* stands for

the notion that a licensor would need to license a patent application in order to also lawfully

license a subsequent patent that does not actually issue to the licensor.  (Tr. at 83)

In *Cornell*, the District of Delaware rejected the defendant's argument that the asserted

patents were subject to a covenant not to sue.  *Cornell Univ.*, 2014 WL 12601516, at *4-5.  The

covenant not to sue, which Applera Corporation ("Applera") entered into with the defendant,

Illumina, Inc. ("Illumina"), provided Illumina with protection from suit for certain other "*patents*

. . . owned or licensed by Applera" as of or after the effective date of a settlement agreement

between Applera and Illumina. *Id.* at \*4 (internal quotation marks and citation omitted, emphasis added). Meanwhile, at the time the Applera/Illumina agreement was signed, Applera had a separate license agreement with the plaintiff, Cornell University ("Cornell"), via which Cornell had granted Applera an exclusive license for the "*[p]atent [a]pplications*" that eventually resulted in the 10 asserted patents. *Id.* (citation omitted, emphasis added). Illumina argued that Applera's exclusive license from Cornell guaranteed that Applera would be protected from infringement from any patents that issued from the applications referenced in the license agreement (like the 10 asserted patents at issue in the case), and thus that Illumina (through the covenant not to sue it received from Applera) was similarly protected from suit as to those patents. *Id.* The *Cornell* Court, comparing the language of the covenant not to sue with that of the exclusive license, disagreed that the two agreements were equally broad; it noted that the covenant not to sue did not include the phrase "patent applications." *Id.* The Court refused to read that term into the covenant not to sue, and concluded that "[b]ecause Applera only ever had licenses to the *patent applications* that resulted in the patents-in-suit, not the patents themselves," the asserted patents were not subject to the covenant. *Id.* (emphasis added).

Setting aside whether *Cornell* was rightly decided, the decision itself does not support Horizon's position. The circumstances here are simply different than those at play in *Cornell*. The covenant not to sue at issue in *Cornell* merely covered *patents*, while the exclusive license covered only *patent applications*, and so the Court would not read the latter in an expansive way so as to also include the asserted patents that resulted from those applications. But here, in contrast, the 2013 Settlement Agreement expressly granted to Apotex a license to *any patent* that issues from any continuation application of the '838 patent. The Court does not have to read in any language to reach this conclusion—the 2013 Settlement Agreement flatly says this on its

face.  And *Cornell* does not otherwise teach that in the circumstances at issue here, the 2013

Settlement Agreement would have had to expressly license the '096 application to Apotex in

order for Apotex to have a license to the resulting '913 patent.

Beyond *Cornell*, Horizon relies upon an agreement (the "Vanda Agreement") that Apotex

struck with Vanda Pharmaceuticals, Inc. ("Vanda") in support of the notion that Apotex could

have negotiated broader rights to patent applications if it wanted to (but did not do so here).

(D.I. 52 at 13-14; Tr. at 72-73)  Section 1.10 of the Vanda Agreement defined patent rights as:

(a) certain listed patents and the "patent applications giving rise thereto[;]" (b) "all provisional

applications, divisionals, continuations, continuations-in-part, reissues and renewals that claim

priority to" any applications in (a); (c) "all patents that have issued or in the future issue from

any of the foregoing" applications; and (d) all other relevant patents and patent applications

relating to the products at issue in that agreement.  (D.I. 53, ex. F at § 1.10)  Horizon asserts that

"[t]he Vanda [A]greement that Apotex entered into where Apotex was getting a right to the

subject matter, the patent applications and continuations[,] says clearly:  All patents that issue in

the future based on those applications. . . . that is what [Apotex] want[s] the [2013 Settlement

Agreement] to read as."  (Tr. at 72-73)

Horizon's reliance on the Vanda Agreement is not availing, for two reasons.  First,

Delaware law is clear that "[i]f a contract is unambiguous, extrinsic evidence may not be used to

interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."

*Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 2022) (citation

omitted).  Here, as the Court has noted above, the relevant terms of the 2013 Settlement

Agreement are unambiguous.  Thus, the Vanda Agreement is extrinsic evidence that cannot have

a bearing on the outcome.  (*See* Tr. at 113)  Second, as both parties acknowledge, while it is true

that a patent application can be licensed, "it confers no substantive exclusion rights[.]"  (D.I. 52 at 11; D.I. 69 at 2 n.3; Tr. at 112)  Accordingly, it remains unclear to the Court why Nuvo would have had to expressly grant Apotex a license to the '096 application in order to effectively grant Apotex a license to the '913 patent.

In the end, Horizon points to nothing persuasive that convinces the Court that in the 2013 Settlement Agreement, Nuvo would have had to provide Apotex with a license to the '096 application in order to also be able to convey a license to the '913 patent.  Again, similar to the National Agreement at issue in *Intel*, here the face of the 2013 Settlement Agreement demonstrates the parties' intent that the "license so granted extend not only to the claims then in existence [in the '838 patent] but also to the full scope of any coverage available by way of [continuation] for the invention disclosed."  *Intel Corp.*, 703 F.3d at 1367.  And we know from *Intel* that it does not matter that the continuation patent issued to Horizon instead of to Nuvo; to conclude otherwise would put Apotex in a "position of being exposed to further risk relating to the exact same inventions that were subject to the license[.]"  *Id.*[18]

For these reasons, the Court finds that Apotex has an express license to the '913 patent that defeats Horizon's claim of infringement.  Accordingly, summary judgment in Apotex's favor is warranted.

---

[18]      Horizon also posits that Apotex does not have a license to the '913 patent because Horizon did not acquire any rights or obligations under 2013 Settlement Agreement from Nuvo, and because in the Nuvo-Horizon APA transaction, Nuvo represented that all assets Horizon was purchasing, including the '096 application, were free and clear from all encumbrances.  (D.I. 52 at 2, 14; Horizon's Summary Judgment Presentation, Slide 4)  This argument does not win the day.  That is because, as was explained above, a license runs with a patent and is binding even if a later assignee does not know about the license.  Furthermore, if this argument were correct, it would seem to mean that Horizon would not even need to recognize Apotex's license to the *'838 patent itself*.  (*See* D.I. 64 at 6-7; *see also* D.I. 53, ex. B at 6)  But Horizon does concede, of course, that Apotex has a license to the '838 patent.  (*See* Tr. at 94, 115)

## IV.    CONCLUSION

For the foregoing reasons, the Court finds that Defendants' Motion should be

GRANTED.  An appropriate Order will issue.